

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

September 16, 2015

Anton R. Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
Jenner & Block LLP
919 Third Avenue
New York, NY 10022

### Re: General Motors Company – Deferred Prosecution Agreement

Dear Messrs. Valukas, Schar, and Barkow:

Pursuant to the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office") and the defendant General Motors Company ("GM"),[1] under authority granted by its Board of Directors in the form of the written authorization attached as Exhibit A, hereby enter into this Deferred Prosecution Agreement (the "Agreement").

### The Criminal Information

1. GM consents to the filing of a two-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging GM with engaging in a scheme to conceal a deadly safety defect from its U.S. regulator, in violation of Title 18, United States Code, Section 1001, and committing wire fraud, in violation of Title 18, United States Code, Section 1343. A copy of the Information is attached as Exhibit B. This Agreement shall take effect upon its execution by both parties.

---

[1] For the purposes of this Deferred Prosecution Agreement, to the extent any conduct, statement, actions, or documents occurred on or are dated before July 10, 2009, references to "GM" shall mean and are intended to mean solely "Motors Liquidation Company," previously known as General Motors Corporation ("Old GM"). Although New GM in the Statement of Facts attached as Exhibit C hereto admits certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009 based on New GM's current knowledge, New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM. The Statement of Facts is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order that was issued by the U.S. Bankruptcy Court for the Southern District of New York, or the rights, protections, and responsibilities of New GM under the Sale Order..

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

## Acceptance of Responsibility

2.      GM admits and stipulates that the facts set forth in the Statement of Facts attached as Exhibit C and incorporated herein are true and accurate.  In sum, GM admits that it failed to disclose to its U.S. regulator and the public a potentially lethal safety defect that caused airbag non-deployment in certain GM model cars, and that GM further affirmatively misled consumers about the safety of GM cars afflicted by the defect.

## Forfeiture

3.      As a result of the conduct described in the Information and the Statement of Facts, GM agrees to pay to the United States $900 million (the "Stipulated Forfeiture Amount") representing the proceeds resulting from such conduct.  GM agrees that the allegations contained in the Information and the facts set forth in the Statement of Facts are sufficient to establish that the Stipulated Forfeiture Amount is subject to civil forfeiture to the United States and that this Agreement, Information, and Statement of Facts may be attached to and incorporated into the Civil Forfeiture Complaint to be filed against the Stipulated Forfeiture Amount, a copy of which is attached as Exhibit D hereto.  By this Agreement, GM specifically waives service of said Civil Forfeiture Complaint and agrees that a Final Order of Forfeiture may be entered against the Stipulated Forfeiture Amount.  Upon payment of the Stipulated Forfeiture Amount, GM shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds.  GM agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Forfeiture Amount and will not assist a third party in asserting any claim to the Stipulated Forfeiture Amount.  GM agrees that the Stipulated Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes.  GM agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

4.      GM shall transfer $900 million to the United States by no later than September 24, 2015 (or as otherwise directed by the Office following such date).  Such payment shall be made by wire transfer to the United States Marshals Service, pursuant to wire instructions provided by the Office.  If GM fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 10 and 11 below.

## Obligation to Cooperate

5.      GM has cooperated with this Office's criminal investigation and agrees to cooperate fully and actively with the Office, the Federal Bureau of Investigation ("FBI"), the Department of Transportation ("DOT"), the Office of the Special Inspector General  for the Troubled Asset Relief Program ("SIGTARP"), the National Highway Traffic Safety Administration ("NHTSA"), and any other agency of the government designated by the Office

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

regarding any matter relating to the Office's investigation about which GM has knowledge or information.

6.      It is understood that GM shall (a) truthfully and completely disclose all information with respect to the activities of itself and its subsidiaries, as well as with respect to the activities of officers, agents, and employees of GM and its subsidiaries, concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) cooperate fully with the Office, FBI, DOT, SIGTARP, NHTSA, and any other law enforcement agency designated by the Office; (c) attend all meetings at which the Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of GM or its subsidiaries at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (e) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in GM's possession, custody or control as may be requested by the Office, FBI, DOT, SIGTARP, NHTSA, or designated law enforcement agency; (f) volunteer and provide to the Office any information and documents that come to GM's attention that may be relevant to the Office's investigation of this matter, any issue related to the Statement of Facts, and any issue that would fall within the scope of the duties of the independent monitor (the "Monitor") as set forth in paragraph 15; (g) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, FBI, DOT, SIGTARP, NHTSA, or designated law enforcement agency, including but not limited to information and testimony concerning the conduct set forth in the Information and Statement of Facts; (h) bring to the Office's attention all criminal conduct by or criminal investigations of GM or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which GM's Board of Directors, senior management, or United States legal and compliance personnel are aware; (i) bring to the Office's attention any administrative or regulatory proceeding or civil action brought by or investigation conducted by any U.S. governmental authority that alleges fraud by GM; and (j) commit no crimes whatsoever under the federal laws of the United States subsequent to the execution of this Agreement. In the event the Office determines that information it receives from GM pursuant to this provision should be shared with DOT and/or NHTSA, the Office may request that GM provide such information to DOT and/or NHTSA directly. GM will submit such information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. Nothing in this Agreement shall be construed to require GM to provide any information, documents or testimony protected by the attorney-client privilege, work product doctrine, or any other applicable privilege.

7.      GM agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

Court's acceptance of this Agreement, unless otherwise extended pursuant to paragraph 12 below. GM's obligation to cooperate is not intended to apply in the event that a prosecution against GM by this Office is pursued and not deferred.

## Deferral of Prosecution

8.      In consideration of GM's entry into this Agreement, the actions it has taken to date to demonstrate acceptance and acknowledgement of responsibility for its conduct (including, among other things, conducting a swift and robust internal investigation, furnishing this Office with a continuous flow of unvarnished facts gathered during the course of that internal investigation, voluntarily providing, without prompting, certain documents and information otherwise protected by the attorney-client privilege, providing timely and meaningful cooperation more generally in the investigation conducted by this Office, terminating wrongdoers, and establishing a full and independent victim compensation program that has to date paid out hundreds of millions of dollars in awards), and its commitment to: (a) continue to accept and acknowledge responsibility for its conduct; (b) continue to cooperate with the Office, FBI, DOT, SIGTARP, NHTSA, and any other law enforcement agency designated by this Office; (c) make the payments specified in this Agreement; (d) comply with Federal criminal laws; and (e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the Court that prosecution of GM on the Information be deferred for three years from the date of the signing of this Agreement.  GM shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.  GM shall expressly waive any objection to venue with respect to any charges arising out of the conduct described in the Statement of Facts and shall expressly consent to the filing of the Information in the Southern District of New York.

9.      It is understood that this Office cannot, and does not, agree not to prosecute GM for criminal tax violations.  However, if GM fully complies with the terms of this Agreement, no testimony given or other information provided by GM (or any other information directly or indirectly derived therefrom) will be used against GM in any criminal tax prosecution. In addition, the Office agrees that, if GM is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice as to GM of the Information filed against GM pursuant to this Agreement.  Except in the event of a violation by GM of any term of this Agreement, the Office will bring no additional charges against GM, except for criminal tax violations, relating to its conduct as described in the admitted Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than GM and its subsidiaries.  GM and the Office understand that the Agreement to defer prosecution of GM must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2).  Should the Court decline to approve the Agreement to defer prosecution for any reason, both the Office and GM are released from any

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 10.

10.    It is further understood that should the Office in its sole discretion determine based on facts learned subsequent to the execution of this Agreement that GM has: (a) knowingly given false, incomplete or misleading information to the Office, FBI, DOT, SIGTARP, or NHTSA, either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, GM shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including but not limited to a prosecution based on the Information, the Statement of Facts, or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of GM to the Office and/or FBI, DOT, SIGTARP, or NHTSA at any time. In any such prosecution, no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period, excluding (a) any period subject to any prior or existing tolling agreement between the Office and GM and (b) the period from the execution of this Agreement until its termination. GM agrees to toll, and exclude from any calculation of time, the running of the applicable criminal statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 12 below. By this Agreement, GM expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of GM's counsel.

11.    It is further agreed that in the event that the Office, in its sole discretion, determines that GM has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of GM to the Office, FBI, DOT, SIGTARP, and/or NHTSA, including but not limited to the Statement of Facts, or any testimony given by GM or by any agent of GM before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against GM; and (b) GM shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of GM before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

12.    GM agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 8 above (or any extensions thereof) that GM has violated any provision of this Agreement, an extension of the period of deferral of prosecution

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years.

13.     GM, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement.  Consistent with this provision, GM may raise defenses and/or assert affirmative claims and defenses in any proceedings brought by private and/or public parties as long as doing so does not contradict the Statement of Facts or such representations.  Any such contradictory statement by GM, its present or future attorneys, agents, or employees shall constitute a violation of this Agreement and GM thereafter shall be subject to prosecution as specified in paragraphs 8 through 11, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 12, above.  The decision as to whether any such contradictory statement will be imputed to GM for the purpose of determining whether GM has violated this Agreement shall be within the sole discretion of the Office.  Upon the Office's notifying GM of any such contradictory statement, GM may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within two business days after having been provided notice by the Office.  GM consents to the public release by the Office, in its sole discretion, of any such repudiation.  Nothing in this Agreement is meant to affect the obligation of GM or its officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

14.     GM agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 10 and 11 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 12.  GM understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court.  Should the Office determine that GM has violated this Agreement, the Office shall provide notice to GM of that determination and provide GM with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by GM.

### Independent Monitor

15.     GM agrees to retain a Monitor upon selection by the Office and approval by the Office of the Deputy Attorney General, whose powers, rights and responsibilities shall be as set forth below.

(a).     Jurisdiction, Powers, and Oversight Authority.  To address issues related to the Statement of Facts and Information, the Monitor shall have the authorities and duties defined below.  The scope of the Monitor's authority is to review and assess GM's policies, practices or procedures as set forth below, and is not intended to include substantive review of the correctness of any of GM's prior, present, or future decisions relating to compliance with NHTSA's regulatory regime, including the National Traffic and Motor Vehicle

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

Safety Act, its implementing regulations, and related policies. Nor is it intended to supplant NHTSA's authority over decisions related to motor vehicle safety. Except as expressly set forth below, the authority granted below shall not include the authority to exercise oversight, or to participate in, decisions by GM about product offerings, decisions relating to product development, engineering of GM vehicles, capital allocation, and investment decisions.

> (1).    Review and assess the efficacy of GM's current policies, practices, and procedures in ensuring that GM corrects prior statements and assurances concerning motor vehicle safety;

> (2).    Review and assess the effectiveness of GM's current policies, practices, or procedures for sharing allegations and engineering analyses associated with lawsuits and not-in-suit matters with those responsible for recall decisions;

> (3).    Review and assess GM's current compliance with its stated recall processes; and

> (4).    Review and assess the adequacy of GM's current procedures for addressing known defects in certified pre-owned vehicles.

It is the intent of this Agreement that the provisions regarding the Monitor's jurisdiction, powers, and oversight authority and duties be broadly construed, subject to the following limitation: the Monitor's responsibilities shall be limited to GM's activities in the United States, and to the extent the Monitor seeks information outside the United States, compliance with such requests shall be consistent with the applicable legal principles in that jurisdiction. GM shall adopt all recommendations submitted by the Monitor unless GM objects to any recommendation and the Office agrees that adoption of such recommendation should not be required.

> (b).    <u>Access to Information</u>. The Monitor shall have the authority to take such reasonable steps, in the Monitor's view, as necessary to be fully informed about those operations of GM within or relating to his or her jurisdiction. To that end, the Monitor shall have:

> (1).    Access to, and the right to make copies of, any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or electronic records, including e-mails, of GM and its subsidiaries, and of officers, agents, and employees of GM and its subsidiaries, within or relating to his or her jurisdiction that are located in the United States; and

> (2).    The right to interview any officer, employee, agent, or consultant of GM conducting business in or present in the United States and to participate in any meeting in the United States concerning any matter within or relating to the Monitor's jurisdiction.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

To the extent that the Monitor seeks access to information contained within privileged documents or materials, GM shall use its best efforts to provide the Monitor with the information without compromising the asserted privilege.

        (c).    <u>Confidentiality</u>.

        (1).    The Monitor shall maintain the confidentiality of any non-public information entrusted or made available to the Monitor.   The Monitor shall share such information only with the Office, FBI and SIGTARP.  The Monitor may also determine that such information should be shared with DOT and/or NHTSA.  In the event of such a determination, the Monitor may request that GM provide the subject information directly to DOT and/or NHTSA.  GM will submit such information to DOT or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7.

        (2).    The Monitor shall sign a non-disclosure agreement with GM prohibiting disclosure of information received from GM to anyone other than to the Office, FBI, DOT, SIGTARP or NHTSA, and anyone hired by the Monitor.  Within thirty days after the end of the Monitor's term, the Monitor shall either return anything obtained from GM, or certify that such information has been destroyed.  Anyone hired by the Monitor shall also sign a non-disclosure agreement with similar return or destruction requirements as set forth in this sub-paragraph.

        (d).    <u>Hiring Authority</u>.  The Monitor shall have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel necessary to assist in the proper discharge of the Monitor's duties.

        (e).    <u>Implementing Authority</u>.  The Monitor shall have the authority to take any other actions in the United States that are necessary to effectuate the Monitor's oversight and monitoring responsibilities.

        (f).    <u>Miscellaneous Provisions</u>.

        (1).    <u>Term</u>.  The Monitor's authority set forth herein shall extend for a period of three years from the commencement of the Monitor's duties, except that (a) in the event the Office determines during the period of the Monitorship (or any extensions thereof) that GM has violated any provision of this Agreement, an extension of the period of the Monitorship may be imposed in the sole discretion of the Office, up to an additional one-year extension, but in no event shall the total term of the Monitorship exceed the term of the Agreement; and (b) in the event the Office, in its sole discretion, determines during the period of the Monitorship that the employment of a Monitor is no longer necessary to carry out the purposes of this Agreement, the Office may shorten the period of the Monitorship.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

(2).    <u>Selection of the Monitor.</u>    The Office shall consult with GM, including soliciting nominations from GM, using its best efforts to select and appoint a mutually acceptable Monitor (and any replacement Monitors, if required) as promptly as possible. In the event that the Office is unable to select a Monitor acceptable to GM, the Office shall have the sole right to select a monitor (and any replacement Monitors, if required). To ensure the integrity of the Monitorship, the Monitor must be independent and objective and the following persons shall not be eligible as either a Monitor or an agent, consultant or employee of the Monitor: (a) any person previously employed by GM; or (b) any person who has been directly adverse to GM in any proceeding. The selection of the Monitor must be approved by the Deputy Attorney General.

(3).    <u>Notice regarding the Monitor; Monitor's Authority to Act on Information received from Employees; No Penalty for Reporting.</u>    GM shall establish an independent, toll-free answering service to facilitate communication anonymously or otherwise with the Monitor. Within 10 days of the commencement of the Monitor's duties, GM shall advise its employees of the appointment of the Monitor, the Monitor's powers and duties as set forth in this Agreement, the toll-free number established for contacting the Monitor, and email and mail addresses designated by the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no agent, consultant, or employee of GM shall be penalized in any way for providing information to the Monitor. In addition, such notice shall direct that, if an employee is aware of any violation of any law or any unethical conduct that has not been reported to an appropriate federal, state or municipal agency, the employee is obligated to report such violation or conduct to GM's compliance office in the United States or the Monitor. The Monitor shall have access to all communications made using this toll-free number. The Monitor has the sole discretion to determine whether the toll-free number is sufficient to permit confidential and/or anonymous communications or whether the establishment of an additional toll-free number is required. Further, the Monitor shall inform GM of communications made to the Monitor regarding motor vehicle safety so that GM can address any allegations consistent with its Code of Conduct and related policies and procedures.

(4).    <u>Reports to the Office.</u>  The Monitor shall keep records of his or her activities, including copies of all correspondence and telephone logs, as well as records relating to actions taken in response to correspondence or telephone calls. If potentially illegal or unethical conduct is reported to the Monitor, the Monitor may, at his or her option, conduct an investigation, and/or refer the matter to the Office. The Monitor should, at his or her option, refer any potentially illegal or unethical conduct to GM's compliance office. The Monitor may report to the Office whenever the Monitor deems fit but, in any event, shall file a written report not less often than every four months regarding: the Monitor's activities; whether GM is complying with the terms of this Agreement; and any changes that are necessary to foster GM's compliance with any applicable laws, regulations and standards related to the Monitor's jurisdiction as set forth in paragraph 15(a). Such periodic written reports are to be provided to GM and the Office. The Office may, in its sole discretion, provide to FBI and SIGTARP all or part of any such periodic written report, or other information provided to the Office by the Monitor. The Office may also

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

determine that all or part of any such periodic report, or other information provided to the Office by the Monitor, be provided to DOT and/or NHTSA. In the event of such a determination, the Office may request that GM transmit such report, part of a report, and/or non-public information to DOT and/or NHTSA directly. GM will submit such report, part of a report, and/or non-public information to DOT and/or NHTSA consistent with the regulatory provisions related to the protection of confidential business information contained in 49 C.F.R. Part 512 and 49 C.F.R. Part 7. GM may provide all or part of any periodic written reports to NHTSA or other federal agencies or governmental entities. Should the Monitor determine that it appears that GM has violated any law, has violated any provision of this Agreement, or has engaged in any conduct that could warrant the modification of his or her jurisdiction, the Monitor shall promptly notify the Office, and when appropriate, GM.

(5).    <u>Cooperation with the Monitor</u>.    GM and all of its officers, directors, employees, agents, and consultants, and all of the officers, directors, employees, agents, and consultants of GM's subsidiaries shall have an affirmative duty to cooperate with and assist the Monitor in the execution of his or her duties provided in this Agreement and shall inform the Monitor of any non-privileged information that may relate to the Monitor's duties or lead to information that relates to his or her duties. Failure of any GM officer, director, employee, or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for the Monitor to recommend dismissal or other disciplinary action.

(6).    <u>Compensation and Expenses</u>.    Although the Monitor shall operate under the supervision of the Office, the compensation and expenses of the Monitor, and of the persons hired under his or her authority, shall be paid by GM. The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly rates. GM shall pay bills for compensation and expenses promptly, and in any event within 30 days. In addition, within one week after the selection of the Monitor, GM shall make available office space, telephone service and clerical assistance sufficient for the Monitor to carry out his or her duties.

(7).    <u>Indemnification</u>.    GM shall provide an appropriate indemnification agreement to the Monitor with respect to any claims arising out of the performance of the Monitor's duties.

(8).    <u>No Affiliation</u>.    The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of GM.

<u>Limits of this Agreement</u>

16.    It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by GM or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators,

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

as applicable, this Agreement, the cooperation of GM, and GM's compliance with its obligations under this Agreement.

## Public Filing

17.     GM and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

18.     The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

## Execution in Counterparts

19.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

Anton R Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.
September 16, 2015

## Integration Clause

20.    This Agreement sets forth all the terms of the Deferred Prosecution
Agreement between GM and the Office.  No modifications or additions to this Agreement shall be
valid unless they are in writing and signed by the Office, GM's attorneys, and a duly authorized
representative of GM.

<div style="margin-left:40%">

PREET BHARARA
United States Attorney
Southern District of New York

By:

BONNIE JONAS
SARAH EDDY MCCALLUM
EDWARD A. IMPERATORE
Assistant United States Attorneys


DANIEL L. STEIN
Chief, Criminal Division

</div>

Accepted and agreed to:


Craig Glidden, Esq.


General Counsel and Chief Legal Officer,
General Motors Company


Anton R. Valukas, Esq.
Reid J. Schar, Esq.
Anthony S. Barkow, Esq.


Attorneys for General Motors Company

# Exhibit A

## GENERAL MOTORS COMPANY
### RESOLUTIONS OF THE BOARD OF DIRECTORS

The following resolutions were duly adopted at a meeting of the Board of Directors of General Motors Company held on September 16, 2015:

WHEREAS, the Company has been engaged in discussions with the U.S. Attorney's Office for the Southern District of New York (the "U.S. Attorney's Office") in connection with an investigation being conducted by the U.S. Attorney's Office of the Company's recalls of vehicles equipped with a defective ignition switch and related matters (the "Investigation"); and

WHEREAS, the Board has determined that it is in the best interest of the Company to enter into a Deferred Prosecution Agreement with the U.S. Attorney's Office that would resolve the Investigation on the terms that have been presented by and discussed with the U.S. Attorney's Office (the "DPA").

RESOLVED that the Board hereby authorizes the Company to resolve the Investigation by entering into the DPA on substantially the same terms set forth in materials provided to the Board in advance of the meeting and described to and reviewed with the Board on September 16, 2015;

RESOLVED that the Board hereby authorizes the Company to disclose the DPA, as appropriate, and the Authorized Officers (defined below) are hereby authorized to take all steps necessary to carry out the disclosure of the DPA; and

RESOLVED that the Board hereby authorizes Mr. Craig B. Glidden, General Counsel for the Company, and outside counsel representing the Company from Jenner & Block LLP, acting together, to execute and deliver the DPA on behalf of the Company and further authorizes them and other appropriate officers of the Company, any one of which acting alone (individually and collectively, the "Authorized Officers"), to take any and all other actions as may be necessary or appropriate to effectuate and finalize the DPA.


_Craig B. Glidden_
Craig B. Glidden
General Counsel

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,            :          INFORMATION

          -v.-                       :

GENERAL MOTORS COMPANY,              :          15 Cr. ___

          Defendant.                 :

- - - - - - - - - - - - - - - - - -x

## COUNT ONE
### (Scheme to Conceal Material Facts from a Government Regulator)

The United States Attorney charges:

1.     GENERAL MOTORS COMPANY ("GM" or the "Company"), the defendant, is an automotive company headquartered in Detroit, Michigan.  In 2012, GM was the largest automotive company in the world.

2.     At all times relevant to this Information, GM designed, manufactured, assembled, and sold Chevrolet brand vehicles.  From the earliest date relevant to this Information until in or about 2010, GM designed, manufactured, assembled, and sold Pontiac brand vehicles.  From the earliest date relevant to this Information until in or about 2009, GM designed, manufactured, assembled, and sold Saturn brand vehicles.  And from the earliest date relevant to this Information until in or about the spring of 2013, GM promoted

sales of "pre-owned" (i.e., used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.     At all times relevant to this Information, GM was required to disclose to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA"), any defect in its cars "related to motor vehicle safety" within five business days of identifying said defect.  See 49 U.S.C. § 30118(c) & 49 C.F.R. § 573.6.

4.     From in or about the spring of 2012 through in or about February 2014, GM, through its agents and employees, concealed a potentially deadly safety defect from NHTSA and the public.  The defect related to an ignition switch that had been designed and manufactured with too-low torque (the "Defective Switch").  As GM knew by no later than 2005, the Defective Switch was prone to too-easy movement from the "Run" to the "Accessory" or "Off" position.  And as GM personnel well knew no later than the spring of 2012, when that movement occurred, the driver would lose not only the assistance of power steering and power brakes but also the protection afforded by the vehicle's frontal airbags in the event of a crash.

5.     Rather than remedy the Defective Switch when its torque deficiencies and attendant stalling consequences became clear no later than in or about 2005, GM continued to sell and manufacture new cars equipped with the Defective Switch.

Moreover, although the public was made aware, through media reports, of the Defective Switch's existence, GM affirmatively assured consumers in or about June 2005 that the Defective Switch presented no "safety" problem.

6.    In or about April 2006, a GM engineer directed that the Defective Switch no longer be used in new cars, and that it be replaced with another, non-defective switch that would bear the same part number as the Defective Switch. Nothing was done at this time to remedy the cars equipped with the Defective Switch that were already on the road.

7.    When the fact that the Defective Switch could cause airbag non-deployment -- and therefore undeniably presented a *safety* defect -- became plain no later than in or about the spring of 2012, GM did not correct its earlier assurance that the Defective Switch posed no "safety" concern. Nor did it recall the affected vehicles.  Instead, it concealed the defect from NHTSA and the public, taking the matter "offline," outside the normal recall process, so that the Company could buy time to package, present, explain, and manage the issue.  Fearing an adverse impact on the Company's business, GM engineers and executives wanted to have answers to all questions that NHTSA, the media, and consumers might pose about the defect before alerting the regulator and the public to it.

8.   GM did not recall the vehicles equipped with the Defective Switch until February 2014.   In the meantime, in or about October 2012 and again in or about November 2013, GM personnel gave presentations to NHTSA in which they touted the robustness of GM's internal recall process and gave the misleading impression that GM worked promptly and efficiently to resolve known safety defects, including, specifically, defects related to airbag non-deployment.

## Statutory Allegations

9.   From in or about the spring of 2012 through in or about February 2014, GM, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, willfully and knowingly did falsify, conceal, and cover up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, GM engaged in a scheme to conceal from its federal U.S. regulator, NHTSA, a potentially deadly safety defect that GM was required to disclose within five business days of discovery thereof.

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT TWO
### (Wire Fraud)

The United States Attorney further charges:

10. The allegations contained in Paragraphs 1 through 8 are repeated and realleged as though fully set forth herein.

11. From in or about the spring of 2012 through in or about the spring of 2013, GM dealerships continued to sell GM-certified pre-owned Chevrolet, Pontiac, and Saturn brand vehicles equipped with the Defective Switch. To promote these sales and give customers assurance about the safety of the cars subject to its certified pre-owned program, GM made representations by means of interstate wires -- that is, over the Internet -- falsely assuring customers of the safety of the used cars they were purchasing. In particular, GM certified that used vehicles sold pursuant to this program had been checked for safety of their ignition systems and keys. In truth and in fact, and as GM well knew, cars equipped with the Defective Switch posed a potentially deadly safety threat related to the cars' ignition switches and keys.

12. In addition to making these false representations as part of its certified pre-owned program, GM, more generally, failed to disclose a material fact that it had a duty to disclose -- namely, that cars equipped with the Defective Switch presented a safety defect. GM's duty to disclose this fact

derived from two sources: (a) its false June 2005 representation
that the Defective Switch presented no safety concern; and (b)
its obligation under applicable regulations to inform NHTSA of
any known safety defect within five business days of discovery
thereof.

<u>Statutory Allegation</u>

13.    From in or about the spring of 2012 through in
or about February 2014, in the Southern District of New York and
elsewhere, GM, the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, did
transmit and cause to be transmitted and aid and abet the
transmission, by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, GM defrauded U.S.
consumers into purchasing its products by concealing information
and making misleading statements about the safety of vehicles
equipped with the Defective Switch.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

14.  As a result of committing the wire fraud offense alleged in Count Two of this Information, GM, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

## Substitute Asset Provision

15.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the

above forfeitable property.

    (Title 18, United States Code, Sections 981 and 982; Title 21
        United States Code, Section 853; and
       Title 28, United States Code, Section 2461.)


                               _Preet Bharara_____
                              PREET BHARARA
                              United States Attorney

# Exhibit
# C

Statement of Facts

Overview

1.     GENERAL MOTORS COMPANY ("GM" or the "Company"), which in 2012 was the largest automotive manufacturer in the world, is headquartered in Detroit, Michigan.[1]

2.     At all times relevant to this Statement of Facts, GM designed, manufactured, assembled, and sold Chevrolet brand vehicles. From the earliest date relevant to this Statement of Facts until in or about 2010, GM designed, manufactured, assembled, and sold Pontiac brand vehicles. From the earliest date relevant to this Statement of Facts until in or about 2009, GM designed, manufactured, assembled, and sold Saturn brand vehicles. And from the earliest date relevant to this Statement of Facts until in or about the spring of 2013, GM promoted sales of "pre-owned" (*i.e.*, used) Chevrolet, Pontiac, and Saturn brand vehicles by GM dealerships nationwide.

3.     As set forth in more detail below, from in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator, the National Highway Traffic Safety Administration ("NHTSA"). It also falsely represented to consumers that vehicles containing the defect posed no safety concern.

4.     The defect at issue is a low-torque ignition switch installed in many of the vehicles identified below, which, under certain circumstances, may move out of the "Run" position (the "Defective Switch"). If this movement occurs, the driver loses the assistance of power steering and power brakes. And if a collision occurs while the switch is in the Accessory or Off position, the vehicle's safety airbags may fail to deploy—increasing the risk of death and serious injury in certain types of crashes in which the airbag was otherwise designed to deploy. The model year cars which may have been equipped with the Defective Switch are the 2005, 2006, and 2007 Chevrolet Cobalt; the 2005, 2006, and 2007 Pontiac G5; the 2003, 2004, 2005, 2006, and 2007 Saturn Ion; the 2006 and 2007 Chevrolet HHR; the 2007 Saturn Sky; and the

---

[1] For the purposes of this Statement of Facts, to the extent any conduct, statement, actions, or documents occurred on or are dated before July 10, 2009, references to "GM" shall mean and are intended to mean solely "Motors Liquidation Company," previously known as General Motors Corporation ("Old GM"). Although New GM in this Statement of Facts admits certain facts about Old GM's acts, conduct, or knowledge prior to July 10, 2009 based on New GM's current knowledge, New GM does not intend those admissions to imply or suggest that New GM is responsible for any acts, conduct or knowledge of Old GM, or that such acts, conduct, and knowledge of Old GM can be imputed to New GM. This Statement of Facts is not intended to alter, modify, expand, or otherwise affect any provision of the July 5, 2009 Sale Order that was issued by the U.S. Bankruptcy Court for the Southern District of New York, or the rights, protections, and responsibilities of New GM under the Sale Order.

2006 and 2007 Pontiac Solstice. To date, GM has acknowledged a total of 15 deaths, as well as a number of serious injuries, that occurred in crashes in which the Defective Switch may have caused or contributed to frontal airbag non-deployment.

5.      Before the Defective Switch went into production in 2002, certain GM engineers knew that it was prone to movement out of the Run position; testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications. But the engineer in charge of the Defective Switch approved its production anyway.

6.      In or about 2004 and 2005, as GM employees, media representatives, and GM customers began to experience sudden stalls and engine shutoffs caused by the Defective Switch, GM considered fixing the problem. However, having decided that the switch did not pose a safety concern, and citing cost and other factors, engineers responsible for decision-making on the issue opted to leave the Defective Switch as it was and simply promulgate an advisory to dealerships with tips on how to minimize the risk of unexpected movement out of the Run position. GM even rejected a simple improvement to the head of the key that would have significantly reduced unexpected shutoffs at a price of less than a dollar a car. At the same time, in or about June 2005, GM issued a statement that acknowledged circumstances where the ignition key could inadvertently move to the Accessory or Off position when the car was running. In response to a further inquiry, GM informed a newspaper that GM did not believe the inadvertent rotation of the ignition key was a safety issue.

7.      From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury.

8.      Yet not until approximately 20 months later, in February 2014, did GM first notify NHTSA and the public of the connection between the Defective Switch and fatal airbag non-deployment incidents. This announcement accompanied an initial recall of approximately 700,000 vehicles—a population that would, by March 2014, grow to more than 2 million.

9.      Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed this recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process. On at least two occasions while the Defective Switch condition was well known by some within GM but not disclosed to the public or NHTSA, certain GM personnel made incomplete and therefore misleading presentations to NHTSA assuring the regulator that GM would and did act promptly, effectively, and in accordance with its formal recall policy to respond to safety problems—including airbag-related safety defects.

10.     Moreover, for much of the period during which GM failed to disclose this safety defect, it not only failed to correct its June 2005 assurance that the Defective Switch posed no safety concern but also actively touted the reliability and safety of cars equipped with the Defective Switch, with a view to promoting sales of used GM cars. Although GM sold no *new* cars equipped with the Defective Switch during this period, GM dealers were still, from in or about the spring of 2012 through in or about the spring of 2013, selling pre-owned Chevrolet, Pontiac, and Saturn brand cars that would later become subject to the February 2014 recalls. These sales were accompanied by certifications from GM, assuring the unwitting consumers that the vehicles' components, including their ignition systems and keys, met all safety standards.

11.     After the spring of 2012 but before the recall was announced, the fifteenth Company-acknowledged death associated with the Defective Switch occurred.

<u>Regulatory Framework and GM's Formal Recall Process</u>

12.     Under regulations applicable to GM at all relevant times, the Company was required to disclose to NHTSA any "defect . . . related to motor vehicle safety." "Motor vehicle safety" was defined as "performance of a motor vehicle . . . in a way that protects the public against unreasonable risk of accidents . . . and against unreasonable risk of death or injury in an accident." 49 U.S.C. §§ 30118(c)(1); 30102(a)(8). Such disclosure had to be "submitted not more than 5 working days after a defect in a vehicle or item of equipment ha[d] been determined to be safety related." *See* 49 U.S.C. § 30118(c) and 49 C.F.R.§ 573.6.[2]

13.     The required disclosure was to be made by filing a "Defect Information Report" or "DIR." An auto manufacturer's filing of a DIR with NHTSA is commonly referred to as a "recall."

14.     At all times relevant to this Statement of Facts, GM had a formal recall decision-making process, called the Field Performance Evaluation or "FPE" process, the steps of which were well documented. According to Company policy, the FPE process was supposed to be initiated by dedicated engineers in the Product Investigations ("PI") group. PI, which was at all relevant times headed by GM's Director of Safety & Crashworthiness or Director of Product Investigations, was responsible for identifying and investigating suspected safety and compliance problems with GM cars.

15.     Once PI had completed its investigation of a suspected safety problem, it would, according to GM policy, hand the matter off from the engineering side of the house to the

---

[2] Congress has adopted no criminal penalty for violating this regulatory disclosure requirement. Instead, in order for a company to be held criminally liable under federal law for even an egregious failure to report a known safety defect, its conduct must have independently violated some other federal law to which criminal penalties do attach.

"Quality" organization—specifically, to the "FPE Director." This entailed presenting the problem at a weekly Investigation Status Review ("ISR") meeting attended by the FPE Director, GM's Director of Safety & Crashworthiness or Director of Product Investigations, and a member of GM's legal department.

16.     If, based on PI's presentation at the ISR, these three individuals believed that the matter involved a potential safety defect, they were to advance it for consideration by the Field Performance Evaluation Team ("FPET"). The FPET had no recall decision-making authority but was tasked with gathering information needed to execute a potential recall.

17.     At roughly the same time that the FPET was apprised of the issue, the matter was also supposed to go before the Field Performance Evaluation Review Committee ("FPERC"). The FPERC would make a preliminary decision about whether the issue under consideration qualified as a "defect . . . related to motor vehicle safety" under the applicable regulations and thus warranted a recall. It would then transmit its recommendation to the ultimate recall decision-making body, the Executive Field Action Decision Committee ("EFADC"). The EFADC was at all relevant times made up of three GM Vice Presidents.

18.     Typically, the EFADC's decision would have followed within approximately a week of the FPET's and the FPERC's consideration of the matter. If the EFADC voted for a recall, that decision would be reported to NHTSA within five business days, at which time a DIR would also be filed.

### GM Equips Cars with a Defective Switch

19.     In the early 2000s, GM launched a series of compact cars that it marketed as affordable, safe, and fuel-efficient—features particularly attractive to young, first-time car owners. One of these small cars was the Saturn Ion, first launched in 2002. Another was the Chevrolet Cobalt, launched in 2004. These two models belonged to GM's "Delta" platform, and, from their respective launches until around late 2006, both were equipped with the same defective ignition switch (the Defective Switch). The Defective Switch would also be installed in other, less popular Chevrolet, Saturn, and Pontiac models from in or about 2004 through in or about late 2006.

20.     Development of the switch that would end up first in the Ion and then in the Cobalt and other models began in the late 1990s. By March 2001, the GM design release engineer then in charge of the Ion's switch (the "Switch DRE") had finalized the applicable design specifications and communicated them to the supplier in charge of testing and manufacturing the component (the "Switch Supplier"). Among the specifications communicated to the Switch Supplier was that the torque necessary to move the switch from Run to Accessory must be no less than 15 Newton centimeters ("N-cm") (the "Torque Specification").

Mechanically, this torque performance was to be maintained by a detent plunger and spring within the switch.

21.     Testing conducted by the Switch Supplier in 2001 and early 2002 revealed that an early version of the pre-production Defective Switch was not meeting the Torque Specification; it repeatedly scored "Not OK." A July 2001 pre-production report for the Ion within GM made the same observation: the switch had "low detent plunger force."

22.     In email correspondence between the Switch DRE and the Switch Supplier in early 2002, the Switch Supplier confirmed that an early version of the Defective Switch was not meeting the Torque Specification and outlined the problems that might arise if the part were brought into compliance—including pressure on other switch components, delay, and increased costs. Saying that he was "tired of the switch from hell" and did not want to either compromise the electrical performance of the switch or slow the production schedule, the Switch DRE directed the Switch Supplier to "maintain present course" notwithstanding that there was "still too soft of a detent." Accordingly, the Defective Switch was put into production and installed into the first model year of the Ion (model year 2003), which was first sold to the public in 2002.

23.     By email dated March 28, 2002, the Switch DRE recommended that the Defective Switch also be used in the Cobalt, which was to launch the next year. GM followed that recommendation.

24.     Almost immediately, customers began to report problems with cars equipped with the Defective Switch. Meanwhile, GM employees tasked with driving early production versions of the Ion and then the Cobalt were reporting stalls while driving, and some of them were able to attribute the problem to the easy rotation of the key within the Defective Switch.

25.     Members of the press covering the Cobalt's launch also experienced the unexpected shutoff problem. Alerted by one of the press reports, two executives in charge of safety at GM[3] determined to experience for themselves the complained-of phenomenon. In June 2005, they test drove a Cobalt and found that, as reported, the Cobalt could be easily keyed off by contact with the driver's knee.

26.     Shortly afterward, GM issued a press statement acknowledging the problem as it pertained to the Cobalt, which had the greatest number of consumer complaints: "In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running." The press release further recommended that drivers remove "nonessential material from their key rings." Before its public release, this statement was reviewed and approved by the

_____

[3] The two executives were GM's then-Director of Vehicle Safety & Crashworthiness and the Senior Manager of the PI group (the "PI Senior Manager").

PI Senior Manager and by the senior GM attorney who advised engineers about safety- and recall-related issues (the "GM Safety Attorney"). In a response to further media inquiry, GM stated that it did not believe this condition presented a safety concern.

27.     A June 2005 *Cleveland Plain Dealer* article reporting on the ignition switch problem marveled at GM's public statement, commenting "you have to admit it is pretty funny to hear somebody pretend that turning off the engine by mistake isn't a safety issue."

28.     Just days before this article was published, GM engineers working on the Pontiac Solstice, another new car equipped with the Defective Switch, learned of a complaint about a Solstice that had experienced the same inadvertent shutoff problem as had been reported in the Ion and the Cobalt.

## GM Considers a Fix

29.     In November 2004, the Company opened the first of six engineering inquiries that would be initiated in the ensuing five years to consider ameliorative engineering changes for new cars being rolled off the production line. This first inquiry was closed "with no action" in March 2005. Fixes such as improving the torque performance of the Defective Switch itself and changing the head of the associated key to reduce the likelihood of inadvertent movement from Run to Accessory were rejected as not representing "an acceptable business case." Having decided that the switch did not pose a safety concern, GM engineers concluded that each proposed solution would take too long to implement, would cost too much, and would not fully fix "the possibility of the key being turned (ignition turn off) during driving."

30.     Accordingly, GM decided to keep producing and selling new Cobalts, Ions, Solstices, Skys, G5s, and HHRs equipped with the Defective Switch.

31.     Not all involved in the November 2004 engineering inquiry agreed with this outcome at the time. The Vehicle Performance Manager for the Cobalt believed that the Defective Switch presented a potential safety problem because it could cause sudden loss of power steering and power brakes. (This engineer did not have in mind at the time the loss of power to the airbag system.) He therefore thought a remedy should have been implemented without regard to cost concerns. His views did not prevail.

32.     Meanwhile, in February 2005, while the November 2004 engineering inquiry was still open, the Company released a "Preliminary Information" to its dealers aimed at helping them diagnose and address the Defective Switch problem if a customer experienced it in a 2005 Cobalt or 2005 Pontiac Pursuit.[4] This publication explained that the Defective Switch's too-low "key ignition cylinder torque/effort" could cause "Engine Stalls" and "Loss of Electrical

---

[4] The Ion was not covered by this Preliminary Information.

Systems." It advised dealers to tell customers to remove non-essential items from their key chains. It offered no other fixes.

33.     In May 2005, just two months after the November 2004 engineering inquiry into the Defective Switch was closed without action, a GM brand quality manager opened a second inquiry to consider fixing the problem for new cars. This manager cited a customer complaint that the "vehicle ignition will turn off while driving," and noted that GM was having to buy back Cobalts as a result of the Defective Switch.

34.     Still not believing this was a safety issue, GM engineers closed this inquiry too, without issuing a recall. Although GM engineers involved in the inquiry initially resolved to ameliorate the low torque problem for newly produced 2007 Cobalts by changing the design of the key head so that the key ring would sit in a "hole" rather than a "slot" (thus reducing the lever arm and attendant potential torque), they ultimately rejected this solution.

35.     GM continued producing and selling new cars equipped with the Defective Switch and accompanying slot-head key.

36.     Meanwhile, GM's PI group, which was responsible for addressing problems with cars already on the road, began in the summer of 2005 to study the low torque issue. Like the engineering inquiries targeted at yet-to-be-manufactured cars, this investigation essentially went nowhere. Although PI engineers presented the matter to the ISR (the first stage of the potential recall process) in the summer of 2005, decision-makers who attended that ISR decided that the problem did not present a safety concern and thus did not warrant further consideration for recall. At the time, neither PI nor any member of the ISR seems to have appreciated that one of the electronic systems shut off by an inadvertent movement of the Defective Switch out of the Run position was the airbag system.

37.     Having determined that the problem did not pose a safety concern and thus need not be considered further for recall, GM simply replaced the February 2005 Preliminary Information with a more formal "Service Bulletin" to its dealers (the "2005 Service Bulletin"), alerting them to an "inadvertent turning off" problem and instructing them to provide any complaining customers with inserts for their key heads that would transform the slot into a hole and thus reduce the lever arm. Unlike the Preliminary Information, which accurately described the condition caused by the Defective Switch as (among other things) a "stall," the 2005 Service Bulletin omitted that word. Thus, a dealer responding to a customer inquiry or complaint would not locate the bulletin if he or she only used the word "stall" in the search.

38.     The omission of the word "stall" from the 2005 Service Bulletin was deliberate. The PI Senior Manager, who oversaw and could control the wording of GM service bulletins, directed that the word be kept out of this bulletin even though he knew customers would naturally describe the problem as "stalling." The reason for the omission was to avoid attracting

the attention of GM's regulator, NHTSA. As it had happened, in the interim between the February 2005 Preliminary Information and the 2005 Service Bulletin, some within GM had been meeting with representatives of NHTSA to try to persuade them that defects causing vehicles to stall were not necessarily safety defects warranting recall action. NHTSA agreed that stalls were not necessarily safety issues, but certain GM personnel were also aware of the regulator's sensitivity to stalling problems throughout this period.

39.     Although the bulletin referenced not just the Cobalt but also the HHR, the Ion, the Solstice, and the Pursuit, and although it was updated in October 2006 to cover the model year 2007 versions of these cars and the 2007 Saturn Sky, the customers who would ultimately receive the bulletin's recommended key-head inserts between 2005 and 2014 numbered only about 430.

## The Changes to the Switch and the Key

40.     As of the spring of 2006, the 2005 Service Bulletin was the lone measure in place to address the Defective Switch. There were no systematic efforts to provide key modifications for all owners of affected cars—or even all owners who came into dealerships for service. And every day more and more new cars with the Defective Switch were being manufactured and sold to unwary customers.

41.     In April 2006, that changed. The Switch DRE, who had received numerous complaints about the Defective Switch from other GM employees, authorized replacement of the Defective Switch in new cars with a different one that had a longer detent plunger and therefore significantly greater torque. The Switch DRE further directed, in contravention of accepted GM practice, that this change be implemented without a corresponding part number change. As a result, no one looking at the switch would be able, without taking it apart, to tell the difference between the old, Defective Switch and the new, non-defective one.

42.     Although it was effectuated without a part number change, the switch change that the Switch DRE approved was documented internally, and other engineers were aware of it at the time and afterward. For example, a March 2007 note logged in connection with an engineering inquiry into another matter related to the Ion specifically observed that "[t]he detent plunger torque force was increased" by the Switch DRE in April 2006.

43.     Another relevant change to the Cobalt was made in 2009. Having previously rejected the slot-to-hole alteration to the key head design, GM finally decided to implement that change. An engineer involved in the decision wrote at the time: "This issue has been around since man first lumbered out of [the] sea and stood on two feet." The long-overdue change went into effect for the model year 2010 Cobalt.

<u>The Defective Switch's Deadly Consequences</u>[5]

44.    As noted, the too-easy movement of the Defective Switch from the Run to the Accessory or Off position resulted in an unexpected shutoff of the engine and—as both the February 2005 Preliminary Information and the 2005 Service Bulletin properly described—a "loss of electrical system[s]." These electrical systems included power steering and power brakes. They also included the sensing diagnostic module or "SDM," which controlled airbag deployment. Internal GM documents reflect that although the impact of an engine shutoff on the SDM was not on GM engineers' minds, certain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would "drop," and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag.

45.    And, indeed, the deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously. In July 2004, the 37 year-old driver of a 2004 Ion, a mother of three children and two step-children, died in a crash after her airbags failed to deploy. A few months later, in November 2004, the passenger of a 2004 Ion died in another crash where the airbags failed to deploy. The driver was charged with, and ultimately pled guilty to, negligent homicide. Then, in June 2005, a 40-year-old man suffered serious injuries after his 2005 Ion crashed and the airbags failed to deploy.

46.    For each of these Ion crashes in which the subject vehicles evidently lost power before impact, the SDM data recovered from the crashed vehicles was unilluminating. Unlike the SDM installed in the Cobalt, the Ion's SDM was incapable of recording data—including power mode status—after the vehicle had lost power.

47.    The Cobalt SDM data, by contrast, reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off.

48.    In July 2005, just months after GM closed its first engineering inquiry into the Defective Switch, a 16-year-old driver died in Maryland when the airbags in her 2005 Cobalt failed to deploy. The power mode status recorded for that vehicle at the time of the crash was Accessory.

49.    In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin. The airbags in the vehicle failed to deploy when they should have, and the police officer who

---

[5]  GM has acknowledged 15 deaths occurring in crashes in which the Defective Switch may have caused or contributed to airbag non-deployment, not all of which are described herein. Many other deaths have been alleged to have been associated with the Defective Switch.

examined the crashed vehicle noted in a February 2007 report on the incident that the ignition switch "appeared to have been in the accessory position . . . preventing the airbags from deploying." An April 2007 report about the same crash by Indiana University likewise posited that the airbags had failed to deploy because the key was in the Accessory position. This report even specifically referenced the October 2006 version of the 2005 Service Bulletin, which described the Defective Switch.

50.     In the spring of 2007, NHTSA approached certain GM personnel to express concern about a high number of airbag non-deployment complaints in Cobalts and Ions, and to ask questions about the July 2005 Cobalt crash resulting in the death of the 16-year-old girl. Around this same time, and as a result of NHTSA's inquiries, a GM field performance assessment engineer with expertise in airbags who worked principally with GM lawyers (the "Airbag FPA Engineer") began, at the request of his supervisors, to track reports of crashes in Cobalts where the airbags failed to deploy. And, in May 2007, the PI group even placed the issue of Cobalt airbag non-deployment into the first stage of GM's recall process, the ISR. But the PI group, under the supervision of the PI Senior Manager, conducted no follow-up at the time.

51.     In September 2008, another crash, this one involving a 2006 Cobalt, killed two people. The airbags failed to deploy when they should have. GM sent the crashed car's SDM to the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the power mode status was at one point during the crash recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy. This report was provided in writing, but also in person, at a meeting attended by several GM employees—including a member of the PI group, in-house counsel, and the Airbag FPA Engineer who had been tracking the Cobalt non-deploy incidents.

52.     In April 2009, a 73-year-old grandmother and her 13-year-old granddaughter were killed in rural Pennsylvania in a crash when the ignition switch in the grandmother's 2005 Cobalt slipped into the Accessory position, thereby disabling the frontal airbags and preventing their deployment. The grandmother and her 13-year-old granddaughter, who was in the front passenger seat, both died at the scene. A 12-month-old great grandson, the sole survivor, was paralyzed from the waist down. He was hospitalized for 33 days following the crash.

53.     In December 2009, a 35-year-old Virginia woman crashed her 2005 Cobalt, sustaining serious head injuries and rib fractures (hereinafter, the "Virginia Crash"). The airbags failed to deploy, and, as the Airbag FPA Engineer noted, the power mode at the time of the crash was recorded as Accessory.

54.     Two weeks later, a 25-year-old nursing student died in Tennessee following a head-on collision in her 2006 Cobalt (hereinafter, the "Tennessee Crash"). Again, the airbags failed to deploy when they should have, and the power mode status was recorded as Off at the time of the crash.

55.     In March 2010, a 29 year-old woman was killed in Georgia after her 2005 Cobalt crashed (hereinafter, the "Georgia Crash"). Although there was no allegation that the frontal airbag should have deployed, there was an allegation that loss of power steering caused the crash. The SDM from the vehicle showed that the power mode status was recorded as Accessory at the time of the crash.

56.     Notably, just nine days before the Georgia Crash, GM had conducted a safety recall for a power steering problem in the Cobalt unrelated to the Defective Switch, in which it acknowledged that loss of power steering, standing alone, constituted a "defect . . . relate[d] to motor vehicle safety" and thus warranted recall action. The Defective Switch, of course, caused more than just loss of power steering; it also caused loss of other electrical systems. This was known by many within GM by no later than 2004—even if they did not appreciate precisely what electrical system components were affected (e.g., the airbag SDM). Yet at no time before February 2014 did GM announce a recall for cars associated with the Defective Switch.

### GM Identifies the Connection Between the Ignition Switch and Airbag Non-Deployment and Initiates a Formal Investigation

57.     Many of the deaths and serious injuries associated with airbag non-deployment discussed in the foregoing paragraphs became the subject of legal claims—formal and informal—against GM. Certain GM lawyers, aided by the Airbag FPA Engineer and others like him who assisted in evaluating causes of crashes, realized by no later than early 2011 that a number of these non-deployment cases involved some sort of "anomaly" in the ignition switch. Specifically, in connection with the Tennessee Crash, discussed above, a GM engineer explained to legal staff that when the ignition switch power mode status is in Off (as it was in that case), the SDM "powers down," and the airbags fail to deploy. The engineer further opined that the "a crash sensing system 'anomaly'" resulting in a power mode status of Off had indeed caused non-deployment in the Tennessee Crash case.

58.     This crash sensing "anomaly" risked the prospect of punitive damages. Three months later, GM settled the Tennessee Crash case.

59.     Just days before that settlement, a 15-year-old girl in South Carolina crashed her mother's 2007 Cobalt and suffered significant injuries when the airbag did not deploy. The power mode status was recorded as Accessory at the time of the crash. GM engineers evaluating the crash theorized that, as in the case of the Tennessee Crash, the non-deployment here may have been caused by a crash sensing "anomaly" related to the ignition switch.

60.     Meanwhile, the GM attorney principally responsible for airbag non-deployment claims (the "GM Airbag Attorney"), who had become familiar with a number of Cobalt non-deployment incidents, grew concerned that the "anomaly" identified in these cases was getting insufficient attention from the PI group, which was supposed to investigate and work toward

remedying safety problems with cars on the road. At the time, no one within GM had yet sourced the "anomaly" to the Defective Switch's torque.

61.     Certain members of the legal department took the unusual step of arranging a meeting with PI. The meeting, which took place on July 27, 2011, was attended not just by the PI Senior Manager, who ran the PI group on a day-to-day basis, but also by his boss, the GM Director of Product Investigations (the "GM Safety Director"). Also present were the Airbag FPA Engineer, the GM Airbag Attorney, and the GM Safety Attorney. In advance of the meeting, the PI Senior Manager wrote to a colleague that the Cobalt airbag non-deployment problem was "ugly" and would make for "a difficult investigation."

62.     At the July 27, 2011 meeting, the Airbag FPA Engineer showed photographs of three of the most serious non-deployment crashes he had seen involving Cobalts, including photographs of the Tennessee Crash, and specifically highlighted his observations that many of these Cobalt non-deployment crashes had occurred while the power mode was in Accessory or Off.

63.     After the meeting, the PI Senior Manager assigned an investigator (the "PI Investigator") to examine the matter.

<u>GM Identifies the Defective Switch as the Likely Cause of Airbag Non-Deployment in</u>
<u>2005-2007 Model Year Cobalts</u>

64.     One of the first steps the PI Investigator took, in or about August 2011, was to gather learning and materials from the Airbag FPA Engineer who had been tracking non-deployment incidents in Cobalts since 2007, and who had been involved in evaluating a number of crashes that were the subject of Cobalt non-deployment legal claims. The Airbag FPA Engineer explained to the PI Investigator that he had observed that in some of these cases the power mode was recorded as either Accessory or Off at the time of the subject crashes. The Airbag FPA Engineer further noted that the non-deployment problem appeared to be limited to 2005-2007 model years of the Cobalt and appeared not to affect model years 2008 and later.

65.     By March 2012, more than six months after he had been assigned to the matter, the PI Investigator had done little to advance the investigation. The GM Airbag Attorney called another meeting with PI for March 15, 2012. Attendees at this meeting included the GM Safety Attorney, the GM Airbag Attorney, the GM Safety Director, the PI Investigator, the PI Senior Manager, and the Airbag FPA Engineer. During the meeting, the PI Investigator complained that he needed more support from GM's electrical engineering group to investigate a potential electrical (as opposed to mechanical) explanation for the Accessory and Off power mode recordings in many of the subject crashes.

66.     Two weeks later, the Airbag FPA Engineer, members of GM's electrical engineering group, and others travelled to an auto salvage yard to examine potential electric problems related to the ignition switch—to see whether, as the PI Investigator and others had posited, the Accessory and Off power mode status recordings within the SDMs of the subject vehicles were attributable to an electrical "bounce" in the ignition switch.

67.     At the yard, one of the engineers noticed that the effort needed to turn the ignition switch of the 2006 Cobalt they were examining was low. The group immediately dispatched one of their members to retrieve fish scales from a local bait and tackle shop to measure the rotational force in this and other salvage yard Cobalts. A GM electrical engineer involved in the exercise (the "GM Electrical Engineer") recorded the findings, noted the unusually low force needed to move the examined switches out of Run, searched and found records of customer complaints about the low torque issue, and located the 2005 Service Bulletin addressing the issue.

68.     The next day, the GM Electrical Engineer reported to his own boss these findings and his view that a probable root cause of the non-deployment problem was the Defective Switch moving out of Run to Accessory or Off. And that same day, the boss reported all of this to the PI Senior Manager and to the GM Safety Attorney.

69.     At around the same time, the plaintiffs in a lawsuit stemming from the Virginia Crash, referenced above, located the 2005 Service Bulletin and identified the Defective Switch described therein as the cause of non-deployment in the vehicle at issue in that case. The GM Airbag Attorney identified the 2005 Service Bulletin as potentially related to the Virginia Crash.

70.     In an April 23, 2012 email responding to a query about an ignition switch turning too easily from Run to Off, the PI Senior Manager wrote to colleagues claiming—inexplicably—that he had "not heard of" complaints about low torque in the "Cobalt or other models" since 2005, when the first PI examination was conducted and closed with the issuance of the 2005 Service Bulletin. The PI Investigator, meanwhile, pressed electrical engineers to continue to look into other possible causes of non-deployment, beyond the low torque problem.

71.     No one from PI ushered the matter into the first stage of the formal recall process, the ISR, at this time. This approach represented a stark contrast even to the way in which the Defective Switch itself had been handled in 2005. Back then, *before* the dangerous connection to airbag non-deployment had been drawn, PI had promptly introduced the matter into the ISR.

72.     In May 2012, the GM Safety Attorney asked a GM Vice President to act as an "Executive Champion" in order to propel the matter forward. During the first meeting chaired by this Executive Champion, on May 15, 2012, the GM Electrical Engineer presented his view that the Defective Switch was the cause of non-deployment in the affected Cobalt models. Those in attendance included the GM Safety Attorney, the GM Safety Director, the PI Senior Manager,

the PI Investigator, and others. The Executive Champion encouraged confirmation of this hypothesis through more scientific study.

73.     Days later, on May 22, 2012, such confirmation was obtained. The GM Electrical Engineer, the PI Investigator, and others traveled once more to an auto salvage yard and, using equipment much more sophisticated than fish scales, conducted a thorough study of torque in the ignition switches of several model years of Cobalt, Ion, and other cars. The results confirmed that the majority of vehicles from model years 2003 through 2007 exhibited torque performance below the Torque Specification that GM had adopted in 2001. They also showed that starting somewhere in model year 2007 (that is, for vehicles produced at some point in 2006), the torque values were higher and within specification.

74.     The observed discrepancy was, of course, due to the ignition switch part change that the Switch DRE had ordered in April 2006. But neither anyone from PI nor others working on the airbag non-deployment investigation in the spring of 2012 knew yet about that change; the part number was the same for the Defective Switch and the new one. Indeed, when the PI Investigator asked the Switch DRE in early 2012 to detail any changes that might account for the discrepancy observed at the salvage yard, the Switch DRE denied any of relevance. This was baffling to the PI Investigator and others.

75.     Still, the engineers involved knew that studied cars built before a certain point in 2006 were equipped with low-torque ignition switches, and that low torque in an ignition switch could result in airbag non-deployment. At this time, no further engineering tests were conducted to explore any other purported root cause of the observed non-deployment pattern or to compare the 2005 through 2007 model year Cobalt ignition switches with those of later model years.

76.     On June 12, 2012, three weeks after the May 2012 salvage yard expedition, an expert retained by the Virginia Crash plaintiffs issued a report. Noting both the 2005 Service Bulletin and the Indiana University study from 2007 that had identified a connection between the Defective Switch and non-deployment of an airbag in a fatal Cobalt crash, the expert opined that the Defective Switch was indeed responsible for non-deployment in the Virginia Crash. In early July, outside counsel for GM forwarded the Virginia Crash expert's report to the GM Airbag Attorney. In late July, the GM Airbag Attorney forwarded the Indiana University study to the PI Senior Manager, the GM Safety Attorney, and the Airbag FPA Engineer.

77.     At a meeting among GM lawyers in late July 2012 in which the Virginia Crash expert's report was discussed, a newly hired GM attorney asked the group why the Cobalt had not been recalled for the Defective Switch. Those present explained that the engineers had yet to devise a solution to the problem but that engineering was looking into it. The new attorney took from this that the GM legal department had done all it could do.

78.     The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director, and others met at lengthy intervals through the summer and fall of 2012 and early 2013 to consider potential solutions and further explore why the defect condition appeared to be limited to earlier model years. As one of the several Executive Champions who would be tasked with overseeing these meetings from early 2012 through 2013 has explained, the purpose of the meetings was *not* to identify the root cause of the problem, which had by approximately the spring of 2012 been traced to the Defective Switch, but rather to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall. Certain GM personnel wanted to be sure that the fix adopted for the problem would be affordable and yet appeal to consumers; that GM would have sufficient parts on hand to address the recall; and that GM representatives would be able to fully articulate to NHTSA and the public a "complete root cause" accounting for the discrepancy between the earlier and later vehicle populations.

### GM's Representations to NHTSA About Its Recall Process

79.     At the same time, the manner in which the responsible GM personnel were approaching the Defective Switch and its deadly consequences in 2012 contrasted with the picture the Company was presenting to NHTSA about its recall process.

80.     On October 22, 2012, certain GM personnel, including the GM Safety Director, met with NHTSA officials in Washington, D.C., and gave a description of the Company's recall process intended to assure the regulator that safety issues were routinely addressed in a methodical and efficient fashion. The presentation, which touted a "common global process" with "standard work templates," explained that the first step toward potential recall involved investigation by PI of the suspected safety problem. Then, according to the presentation, the matter would be placed promptly into the FPE process, which was controlled not by engineers but by personnel in charge of Quality. At this stage, GM further explained, the FPET would consider the logistics of implementing the proposed recall or other contemplated action; the FPERC would recommend the particular field action to be taken (recall or, for example, a customer advisory); and, in short order thereafter, the EFADC would either make the final decision concerning that recommended field action or order "further study." According to individuals who attended this meeting and others in 2012 and 2013, GM gave the impression that its recall process was linear, robust, uniform, and prompt.

81.     To the extent this presentation may have accurately described GM's general recall process and handling of other defects, it did not accurately describe GM's handling of the Defective Switch (about which NHTSA would remain unaware until 2014). By approximately

five months prior to this presentation, certain GM personnel had identified what they knew to be a dangerous safety defect and had not started it into the first phase of the recall process.[6]

<u>GM Delays Recall After Learning of the 2006 Switch Change</u>

82.    By early 2013, the Defective Switch *still* had not been introduced into the FPE process. GM was exploring optimal remedies and trying to understand why the defect appeared to affect only a limited population. Those involved remained unaware of the part change that the Switch DRE had made back in April 2006—the change that explained why cars built after around late 2006 seemed not to be affected.

83.    Meanwhile, during this same period, GM lawyers were engaged in heavy litigation related to the Georgia Crash, referenced above. The Georgia Crash plaintiffs' attorney had learned about the 2005 Service Bulletin, and had developed a theory that the Defective Switch caused the driver to lose control of her vehicle. The attorney was seeking discovery related to the bulletin and the Defective Switch more generally. He was also asking about any design changes that had been made to the switch.

84.    GM denied that any such design changes had been made that would affect the amount of torque it takes to move the key from Run to Accessory.

85.    Then, on April 29, 2013, the Georgia Crash plaintiffs' attorney took the deposition of the Switch DRE. During that deposition, the plaintiffs' attorney showed x-ray photographs of the ignition switch from the subject vehicle (the Defective Switch) and another switch from a later model year Cobalt (one installed after implementation of the Switch DRE's April 2006 part change directive). The photographs showed that the detent plunger in the Georgia Crash car was much shorter—and therefore would have had much lower torque performance—than the one in the later model year Cobalt. The Switch DRE, confronted with these photographs, continued to deny knowledge of any change to the switch that would have accounted for this difference.

86.    But, as the Switch DRE has acknowledged, he knew almost immediately following his deposition that there had been a design change to the switch following production of the model year 2005 Cobalt, and that he must have been the engineer responsible for that design change. He knew as much because, the day after the April 29, 2013 deposition, he

---

[6] As NHTSA and GM understood, GM's regulatory obligation to disclose safety defects within five days of their discovery was an obligation of the Company and not of any individual employee. Indeed, as NHTSA further understood, neither the GM Safety Director nor any other GM employee was authorized to disclose a safety defect to NHTSA without a decision from the EFADC that such a defect existed.

personally collected and took apart switches from a 2005 Cobalt and a later model year Cobalt and observed the difference in lengths of their respective detent plungers.

87.     The Switch DRE has said that he recalls communicating these observations to his boss and to another supervisor and being advised to let the legal department handle the matter.

88.     The GM Safety Attorney learned what transpired during the Switch DRE's deposition. Having previously received a request from the PI group for retention of an outside expert (the "Switch Expert") to help determine why the Defective Switch seemed to affect only a limited vehicle population, the GM Safety Attorney, on or about May 2, 2013, authorized retention of the Switch Expert in connection with the Georgia Crash case. The PI Investigator and the PI Senior Manager did not participate in meetings with the Switch Expert until the Switch Expert presented his conclusions following the settlement of the Georgia Crash case. The PI Investigator understood that he was to put his own investigation on hold pending the Switch Expert's evaluation.

89.     Of course, by the time the Switch Expert had been retained, certain GM personnel had already learned from the Georgia Crash plaintiffs' attorney about the design change to the Defective Switch, and the Switch DRE had already confirmed that the change had in fact occurred. GM thus had an explanation for why the defect condition did not appear to affect cars built after the middle of 2006. And, indeed, some within GM had known for approximately a year that a confirmed population of GM's compact cars was equipped with the Defective Switch. Yet *still* there was no recall; indeed, still there was no move to even place the matter into the FPE process. Instead, GM personnel awaited the study and conclusions of the Switch Expert.

90.     Meanwhile, on June 22, 2013, a 23-year-old man was killed in a crash on a highway near Roxton Pond, Quebec after his 2007 Cobalt left the road and ran into some trees. The driver-side airbag in the Cobalt failed to deploy. The power mode status was recorded as Accessory.

<u>GM Receives Documentary Evidence of the Part Change and Finally Begins the Recall Process</u>

91.     By July 2013, the Switch Expert had confirmed what the Georgia Crash plaintiffs' expert and the Switch DRE had known since no later than April 2013: Cobalts from model years 2008 through 2010 had longer detent plungers and springs than those from model years 2005 and 2006. GM's outside counsel in the Georgia Crash case urged GM in-house lawyers to settle it: "[T]here is little doubt that a jury here will find that the ignition switch used on [the Georgia Crash car] was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. In addition, the [engineering inquiry documents about the Defective Switch from 2004 and 2005] and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to

correct the problem for the last nine years."

92.    GM followed its outside counsel's advice and settled the Georgia Crash case at the end of August 2013, agreeing to pay $5 million.

93.    Then, in late October 2013, GM received documentary confirmation from the Switch Supplier that the Switch DRE had in fact directed a part change to fix the Defective Switch in April 2006. This evidence further showed that the part was changed without a corresponding change to the part number.

94.    Only at this point did GM finally place the Defective Switch matter into the formal FPE process. An ISR was scheduled for November 5, 2013. Meanwhile, on October 30, the PI Investigator, who was by now back working on the matter and helping to lay the practical groundwork for a recall, asked an employee in charge of ordering vehicle parts what the costs of new ignition switch components would be for the 2005 through 2007 Cobalts.

<u>GM Makes Further Statements to NHTSA About Its Recall Process</u>

95.    On July 23, 2013, one day after GM's outside counsel had advised GM to settle the Georgia Crash case and noted that plaintiffs' counsel could make a "compelling" argument that GM "essentially has done nothing to correct" the Defective Switch "for the last nine years," the GM Safety Director received an email from NHTSA's Director of Defects Investigation accusing GM of being "slow to communicate" and "slow to act" in the face of safety defects— including defects unrelated to the Defective Switch (about which NHTSA remained unaware) but related to non-deployment of airbags.

96.    Two days later, certain GM personnel, including the GM Safety Director, met with NHTSA to try to quell the agency's concerns. According to notes taken by the GM Safety Director at that meeting, NHTSA agreed with GM that the Company appeared to have a "robust and rigorous process" for evaluating and addressing safety issues, but worried that it "tend[ed] to focus on proving the issue [wa]s not a safety defect."

97.    On November 7, 2013, two days after the ISR concerning the Defective Switch, certain GM personnel met again with NHTSA, this time to give a more in-depth presentation targeted at assuring the regulator that GM was "responsive" and "customer focused" when it came to safety concerns. Although the presentation did not specifically address the Defective Switch-related airbag non-deployment problem—which, having just entered the recall process within GM, remained unknown to NHTSA—it did address concerns related to airbag non-deployment more generally.

98.    First, certain GM personnel showed NHTSA slides that touted the increasing swiftness with which GM had addressed safety defects from 2008 through 2012. One graph

reflected that the average time taken from identification of the issue through to execution of the recall was 160 days in 2008 and 84 days in 2012. It further showed that the average time an issue remained in the "pre-FPE" stage was 105 days in 2008 and 33 days in 2012. And the average number of days between entry into the FPE process and recall decision was 15 days in 2008 and 13 days in 2012.

99.     Other portions of GM's presentation suggested that any airbag defect that presented with a failure to warn the driver and/or certain other aggravating factors would be recalled swiftly.

<u>GM Delays Recall for Three More Months</u>

100.     Although the Defective Switch matter entered the ISR on November 5, 2013, after approximately *804 days* of formal investigation, and although GM had at the November 7 meeting with NHTSA touted an average lag of just 13 days between entry into the FPE process and recall approval by the EFADC, GM would not ultimately decide to conduct a recall for the Defective Switch until January 31, 2014. The recall was announced to NHTSA seven days later, on February 7, 2014.

101.     The individual principally responsible for shepherding the matter through the FPE process was GM's FPE Director, who worked closely with the GM Safety Director, the GM Safety Attorney, and a member of the EFADC responsible for deciding whether to recall.

102.     As a general matter, EFADCs were scheduled weekly. The Defective Switch matter was initially contemplated for inclusion on the agenda of an EFADC scheduled for November 18. Citing the issue's "complex[ity]," however, an assistant to the FPE Director recommended—and the FPE Director agreed—that the matter be put off until an EFADC scheduled for December 3.

103.     The matter did not go to the EFADC on December 3, however. Instead, it was pushed to December 17. On December 2, the FPE Director met with the GM Safety Director, the PI Investigator, the GM Safety Attorney, and a few others in yet another "offline" meeting to discuss the matter. Then, on December 16, the issue was the subject of an FPERC meeting that had been scheduled to occur right before the December 17 EFADC meeting.

104.     After that meeting, the FPE Director expressed concern about "execution details" of the recall. She explained to one of the three EFADC decision-makers that "[t]he absolute last thing we need to do from a customer perspective is to rush a decision, post it on the NHTSA website that [sic] we have a safety decision but we cannot fix the customer vehicles for some period of time." The FPE Director informed this decision-maker that "we aren't ready for a decision" because there were "[t]oo many items on how we know how the fix will perform and

the competitive solutions." The decision-maker pledged to "push [to] do additional follow up on this prior to a decision."

105.    The EFADC meeting on December 17, 2013 yielded no decision, and further "study" was directed.

106.    By this time, all involved understood—and some had for a period of time understood—that a Cobalt recall was inevitable.

107.    Some within GM—including the GM Safety Director and the GM Safety Attorney—openly expressed concern about how the "timeline" of GM's response to the Defective Switch would look to NHTSA. As noted, a manufacturer must, under applicable regulations, report a known safety defect to NHTSA within five business days of its discovery. Here, certain GM personnel knew by approximately the spring of 2012 that the Defective Switch posed a serious safety issue because it disabled airbags in situations when they should have deployed. Yet more than a year and a half after that discovery, GM still had not conducted a recall.

<u>Recall</u>

108.    On January 31, the voting members agreed that a recall of the affected model year Cobalts, G5s, and Pursuits was warranted. On February 7, 2014, GM announced the recall to the public and NHTSA.

109.    Although other models—the Ion, most notably—were likewise equipped with the Defective Switch, these were not recalled on February 7. The stated reasons for not including these other models varied. Some believed there were differences in electronic architecture and physical switch placement between the unrecalled cars and the recalled cars, such that the risk of switch movement and/or airbag non-deployment was reduced. Others cited an error by the PI Investigator in collecting incident data about the Ion, which they said gave the erroneous impression that there was no comparable problem with the Ion.

110.    In any event, following intense criticism from the press about the limited scope of the February 7 recall, GM held another EFADC meeting on February 24, 2014 to consider the affected model years of the Ion, Sky, HHR, and Solstice. Voting members agreed that the February 7 recall should be expanded to encompass these other models. The next day, GM announced that decision.

<u>GM's Certifications for Pre-Owned Vehicles</u>

111.    All of the cars subject to the February and March 2014 airbag non-deployment recalls were relatively old. GM stopped manufacturing the Ion in 2006; stopped manufacturing

the Cobalt, the G5, the Sky, and the Solstice in 2009; and stopped manufacturing the HHR in 2010.

112.    From in or about the spring of 2012, when certain GM personnel knew that the Defective Switch could cause airbag non-deployment, through at least in or about May of 2013, GM dealerships (which GM had not made aware of the issue) continued to sell "certified pre-owned" cars equipped with the Defective Switch. GM, which profited indirectly from these sales, certified the safety of the vehicles to the public, explaining that the certification process involved testing of over a hundred components, including, specifically, the ignition system.

113.    But the safety certification was made despite there being no change or alteration to either the ignition switch itself or the accompanying key in these cars. The Defective Switch was left intact and unremedied.

114.    Approximately 800 consumers purchased certified pre-owned vehicles equipped with the Defective Switch. The GM dealer certifications thus may have caused consumers who relied on the certifications to buy vehicles that they may incorrectly have believed to be safe.

<div align="center">Conclusion</div>

115.    As detailed above, starting no later than 2003, GM knowingly manufactured and sold several models of vehicles equipped with the Defective Switch. By approximately the spring of 2012, certain GM personnel knew that the Defective Switch could cause frontal airbag non-deployment in at least some model years of the Cobalt, and were aware of several fatal incidents and serious injuries that occurred as a result of accidents in which the Defective Switch may have caused or contributed to airbag non-deployment. This knowledge extended well above the ranks of investigating engineers to certain supervisors and attorneys at the Company—including GM's Safety Director and the GM Safety Attorney. Yet, GM overshot the five-day regulatory reporting requirement for safety defects by approximately 20 months. And throughout this 20-month period, GM failed to correct its 2005 statement that the Defective Switch posed no "safety" problem.

# Exhibit
# D

PREET BHARARA
United States Attorney for the
Southern District of New York
By:   JASON H. COWLEY
      ALEXANDER J. WILSON

Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,            :

               Plaintiff,            :          VERIFIED COMPLAINT

            -v.-                     :          15 Civ. _____

$900,000,000 in United States        :
Currency,

                                     :

               Defendant *in rem*.   :
- - - - - - - - - - - - - - - - -x

     Plaintiff United States of America, by its attorney, PREET

BHARARA, United States Attorney for the Southern District of New

York, for its Verified Complaint (the "Complaint") alleges, upon

information and belief, as follows:

## I.   JURISDICTION AND VENUE

     1.   This action is brought by the United States of

America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the

forfeiture of $900,000,000 in United States Currency (the

"Defendant Funds" or the "defendant-in-rem").

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1355.

3.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because certain acts and omissions giving rise to the forfeiture took place in the Southern District of New York, and pursuant to Title 28, United States Code, Section 1395 because the defendant-in-rem shall be transferred to the Southern District of New York.

4.    The Defendant Funds represent property constituting and derived from proceeds of wire fraud in violation of Title 18, United States Code, Sections 1343, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## II.   PROBABLE CAUSE FOR FORFEITURE

5.    General Motors Company ("GM"), an automotive company headquartered in Detroit, Michigan, entered into a Deferred Prosecution Agreement with the United States, wherein, *inter alia*, GM agreed to forfeit a total of $900,000,000, i.e., the Defendant Funds, to the United States.  GM agrees that the Defendant Funds are substitute *res* for the proceeds of GM's wire fraud offense.  The Deferred Prosecution Agreement, with the

2

accompanying Statement of Facts and Information, is attached as Exhibit A and incorporated herein.

### III. CLAIM FOR FORFEITURE

6.    The allegations contained in paragraphs one through five of this Verified Complaint are incorporated by reference herein.

7.    Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

8.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C. § 1961(1).  Section 1961(1) lists, among others offenses, violations of Title 18, United States Code, Section 1343 (relating to wire fraud).

9.    By reason of the foregoing, the defendant-in-rem is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), as it is substitute *res* for property derived from wire fraud, in violation of Title 18, United States Code, Section 1343.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem and that all persons having an interest in the defendant-in-rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendant-in-rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:     New York, New York
           September 16, 2015

                              PREET BHARARA
                              United States Attorney for
                              Plaintiff United States of America


                    By:    _____
                              JASON H. COWLEY
                              ALEXANDER J. WILSON
                              Assistant United States Attorneys
                              One St. Andrew's Plaza
                              New York, New York 10007
                              (212) 637-2200

4

VERIFICATION

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                   :
SOUTHERN DISTRICT OF NEW YORK )

     KENNETH W. JACOUTOT, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Transportation, Office of Inspector General; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the same is true to the best of his knowledge, information and belief.

     The sources of deponent's information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
Kenneth W. Jacoutot
Special Agent
Department of Transportation,
Office of Inspector General

Sworn to before me this
_16_ th day of September, 2015

_____
Notary Public

NAEEM A. CONWAY
Notary Public, State of New York
No. 01CO6110667
Qualified in New York County
Commission Expires June 01, 2016